UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

MICHELLE SACKETT,     )
             )
     Plaintiff,   )
             )   No. 1:03-CV-159
v.            )
             )   Judge Curtis L. Collier
             )
ITC^DELTACOM, INC., and   )
ITC^DELTACOM      )
COMMUNICATIONS, INC.,   )
             )
     Defendants.  )

# M E M O R A N D U M

## I.  INTRODUCTION

In *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S. Ct. 2118, 144 L.Ed. 2d 494 (1999) the Supreme Court for the first time considered the language providing for punitive damages in the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and provided its construction of that language. In this Title VII lawsuit the Court is now required to apply the holding of *Kolstad* to the particular facts before the Court. In so doing, the Court of necessity must sift through the text of the *Kolstad* opinion, consider the purposes espoused in the decision, and discern the logical extensions or implications of that text. This has led the Court to certain conclusions regarding the precise meaning and contours of *Kolstad.* The Court understands that by venturing into this endeavor it is exploring largely uncharted waters. Because the parties to this action must make important decisions regarding their future course of action, the Court through this opinion shares and informs the parties of those conclusions. This opinion will be as comprehensive as possible because the Court wishes to provide guidance to the litigants and also because much of the law in this area is sparse and

unsettled.

## II. **PROCEDURAL HISTORY**

Plaintiff Michelle Sackett ("Plaintiff") brought this lawsuit[1] against Defendants ITC^Deltacom, Inc. and ITC^Deltacom Communications, Inc. ("Defendants") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, for claims of gender and pregnancy discrimination. In her amended complaint she sought punitive damages (*see* Court File No. 7, p. 4). As is the Court's practice since *Kolstad*, the punitive damages aspect of the trial was bifurcated from the liability and compensatory damages aspect of the trial. The matter proceeded to trial and consumed nine days.[2] Upon the completion of the liability and compensatory damages phase of the trial, the jury returned a verdict in favor of Plaintiff, finding her gender was a motiving factor in the adverse employment action taken against her (*see* Court File No. 89). The jury also awarded her $35,000 in compensatory damages. Thereafter, Plaintiff sought to proceed to the punitive damages phase of the trial. Because it was apparent to the Court the parties did not fully

---

[1]Sackett was one of four plaintiffs whose individual cases were consolidated into Case No. 1-03-CV-159 because each alleged civil rights violations by the same supervisor, Bill Koepsel (*see Julie Whitchurch v. ITC^Deltacom, Inc. and ITC^Deltacom Communications, Inc.*, Case No. 1:03-CV-158; *Lisa Carringer v. ITC^Deltacom, Inc. and ITC^Deltacom Communications, Inc.*, Case No. 1:03-CV-234; and *Sue Jenkins v. ITC^Deltacom, Inc. and ITC^Deltacom Communications, Inc.,* Case No. 1:03-CV-235). All of Julie Whitchurch and Lisa Carringer's claims and Sue Jenkins' claim of retaliation under the Tennessee Human Rights Act were dismissed on summary judgment (*see* Court File Nos. 44, 45).

[2] Sue Jenkins' claim of gender discrimination was tried with Sackett's. However, because Jenkins was unable to meet her burden of proof on one of the elements of her claim, the Court granted the Defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) at the conclusion of both parties' presentation of evidence (*see* Court File Nos. 85, 86).

appreciate the change *Kolstad* had brought about in punitive damages under Title VII, the Court instructed the parties to submit briefs on this issue (*see* Court File No. 92). Since the case had not concluded, the Court did not discharge the jury but rather instructed the jury there was some possibility it would be called back to reconvene for further proceedings. That jury is available for recall to consider additional proof should the Court determine this is an appropriate case for submission of the question of punitive damages to the jury.

Since the case was bifurcated, the trial only concerned issues relevant to liability and compensatory damages. For example, an individual's exact role and authority in the defendant company or companies, past discriminatory conduct on the part of the company or supervisory employees involved in this case, the existence of an antidiscrimination policy, whether such a policy was effective or not, how well such a policy was enforced, and what a particular individual did or did not know about Title VII are all issues with little or no relevance to liability and compensatory damages. However, those issues would be of great relevance to the question of punitive damages. The Court assumes there was evidence the parties possessed that pertained only to the question of punitive damages that was not, and properly should not have been, offered on the liability and compensatory damages issues at trial.[3] Accordingly, to the extent the parties have evidence relevant to punitive damages that was not introduced, they have never had an opportunity to offer such evidence. Moreover, the parties may know of evidence that is relevant to punitive damages that they do not now possess but which they know they could obtain and introduce at the punitive damages aspect of the trial.

---

[3]To date, the only such evidence that has been brought to the Court's attention was Plaintiff's request at the conclusion of the trial she wished to put on proof of Defendants' net worth.

## III.  SUMMARY OF FACTS

The Court will summarize the evidence produced during trial only for the purpose of providing context to the analysis that follows.  This summary also will allow comparison with other cases where punitive damages were an issue.  By setting out this summary, the Court is not attempting to make any factual findings.  In all material respects this was a typical, run-of-the-mill Title VII case.

Defendants are in the telecommunications business and operate branch offices in the southeastern United States.  One branch office was located in Chattanooga, Tennessee.  This branch was opened in early 2000.  During the time period relevant to this law suit the branch manager of that office was Julie Whitchurch who was hired in October 2000.  This branch office sold telecommunications services (Internet connections, local telephone lines, long distance and data services) to business customers.

Each branch office is supervised by a regional director, who oversees several branch offices at any given time.  Bill Koepsel was regional director in charge of the North Alabama region. Branch offices overseen by Koepsel during the relevant time period included the Chattanooga branch, the Florence, Alabama branch, the Huntsville, Alabama branch, the Birmingham, Alabama branch, and the Anniston, Alabama branch. Koepsel was not based in Chattanooga but rather was located in another city and visited the Chattanooga branch periodically.  Among all the branches in its region, the Chattanooga branch generally suffered the poorest sales performance.

Whitchurch hired Plaintiff after meeting her when Plaintiff was working at a shopping mall kiosk selling cellular phones.  Plaintiff had no experience doing the type of work required by Defendants and nothing in her background suggested she had any aptitude for cold call sales, which

4

were a staple of her sales duties with Defendants. Whitchurch provided Plaintiff with little training or direction after she was hired. In fact, Whitchurch had little respect for her supervisor, Koepsel, and was openly defiant and dismissive of him to branch employees. Whitchurch's hostility towards and constant state of conflict with Koepsel contributed to Plaintiff's lack of progress in her sales. Over the few months of her employment, Plaintiff was one of the poorest performing, if not the poorest performing, salesperson in the branch. Each salesperson had a quota of phone lines to sell each month; Plaintiff never met her quota.

After Plaintiff was hired she became pregnant. Plaintiff and some of the witnesses testified that Koepsel's attitude towards her changed after he learned of her pregnancy. According to Plaintiff's testimony, on two occasions when Koepsel was visiting the Chattanooga branch, he called Plaintiff into Whitchurch's office, locked the door, and yelled at her, questioning her about potential child care arrangements and demeaning her because she did not have full custody of her first child. According to Plaintiff, Koepsel accused her of being a failure and hopeless. These meetings in which she was subjected to Koepsel screaming at her lasted an hour and a half. Plaintiff and her witnesses described her demeanor after these meetings as hysterical and said she was crying uncontrollably. Plaintiff also testified Koepsel harassed her during sales meetings and berated her after he found out she was pregnant. Plaintiff was placed on a "performance improvement plan," the ostensible purpose of which was to help her meet her sales quota. Plaintiff and some of her witnesses testified this performance improvement plan deviated from Defendants' standard plan and contained sales goals that were virtually unattainable, and which Koepsel increased after it appeared she would meet them.

Approximately four months after she was hired, and while she was participating in the

performance improvement plan, Plaintiff was terminated by Defendants. Koepsel was the driving

force behind her termination although it is not clear whether he possessed the authority to terminate

employees without approval from others.


## IV.    STATUTE - 42 U.S.C. § 1981a

Prior to 1991, punitive damages were not available in Title VII cases. Congress made such

damages available to prevailing plaintiffs in the 1991 Civil Rights Act ("Act"). The Act provides

for punitive damages with the following language:

> A complaining party may recover punitive damages under this section against a
> respondent (other than a government, government agency or political subdivision)
> if the complaining party demonstrates that the respondent engaged in a
> discriminatory practice or discriminatory practices with malice or with reckless
> indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1).

The statute is silent regarding the standard of proof, *i.e.*, whether the standard is

preponderance of the evidence, clear and convincing evidence, or some other standard. The statute

also is silent as to whether punitive damages should be routinely available to every prevailing

plaintiff or only to some smaller number. The statute does make clear the plaintiff bears the burden

of proving the employer acted with malice or with reckless indifference.


## V.    PRE-*KOLSTAD* PUNITIVE DAMAGES PRACTICE

Prior to the Supreme Court's decision in *Kolstad*, it was the Court's practice in a Title VII

case to submit the issues of liability, compensatory damages, and punitive damages to the jury

simultaneously. *See Evans v. Brach & Brock,* No. 1:97-CV-25 (E.D. Tenn. 1997); *Perry v. United*

*Marketers*, Nos. 2:95-CV-180, 2:95-CV-171, 2:95-CV-172 (E.D. Tenn. 1995). This approach was based on caselaw authorizing punitive damages for actions pursuant to 42 U.S.C. § 1981. *See Smith v. Wade*, 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983); *Beauford v. Sisters of Mercy-Province of Detroit*, 816 F.2d 1104 (6th Cir. 1987). In *Smith*, the Supreme Court decided punitive damages were authorized in civil rights actions brought before the 1991 Civil Rights Act, under 42 U.S.C. § 1981. However, the Supreme Court limited such damages to cases involving a defendant whose conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56.

The thinking behind the Court's one-step approach of submitting all issues to the jury simultaneously was that if a plaintiff prevailed in proving liability, then the plaintiff necessarily had proven the defendant acted intentionally. This finding of intent would then support the jury's finding for punitive damages (*i.e.*, that the defendant acted with evil intent to deprive a plaintiff of his or her federally protected rights). It is the Court's belief that most district courts within the jurisdiction of the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") followed this same practice.

## VI.      *KOLSTAD*

Because the Court's analysis is driven by its understanding of the *Kolstad* decision and that analysis is influenced to some extent by the history and development of that case from the trial court level up to the Supreme Court, the Court will devote some time to a discussion of the history of the case in the lower courts. Such a review is helpful for a greater insight into the decision. For this reason the Court will summarize the procedural history of the case.

## A.    D.C. Circuit Panel Decision

In 1997 a panel of the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") decided *Kolstad v. American Dental Association*, 108 F.3d 1431 (D.C. Cir. 1997). In that Title VII gender discrimination case, the jury found in the plaintiff's favor, awarding her back pay, but the district court refused to instruct the jury on punitive damages, finding insufficient evidence to support them. *Id.* at 1435. The plaintiff then appealed the district court's refusal to instruct the jury on punitive damages and other matters.

The panel considered the standard of proof for punitive damages and held "the standard of proof required to sustain awards of punitive damages under 42 U.S.C. § 1981a is the same as that previously established for punitive awards under 42 U.S.C. §§ 1981 and 1983." *Id.* at 1438. In line with the Court's thinking at that time, the panel explained that the same evidence that established an intentional violation of protected civil rights could also be sufficient to establish the required intent for punitive damages, "provided that the jury, in its discretionary moral judgment, finds that the conduct merits a punitive award." *Id.* (internal citations omitted). The panel concluded by stating in those cases, "[n]o additional evidence is required, because the state of mind necessary to trigger liability for the wrong is at least as culpable as that required to make punitive damages applicable." *Id.* (*quoting Rowlett v. Anheuser-Busch, Inc.* 832 F.2d 194, 205 (1st Cir. 1987) (citations omitted). Accordingly, the panel reversed the decision below and remanded the case to the district court for trial on the plaintiff's punitive damages claim. *Id.* at 1439.

## B.    D.C. Circuit en banc Decision

Instead of the case returning to the district court for trial on punitive damages, en banc review was sought. That request was granted and the panel decision was overturned in an en banc

8

decision in 1998, *Kolstad v. American Dental Association*, 139 F.3d 958 (1998) (en banc). The en banc decision rejected the idea of a single standard of proof for liability and punitive damages, and held the evidence of a defendant's culpability must exceed that necessary to prove intentional discrimination before the question of punitive damages may be presented to the jury. *Id.* at 961. The court adopted a two-tiered system with punitive damages available only in cases where the conduct was "egregious," *id.* at 965, and affirmed the district court's refusal to instruct the jury on punitive damages, finding no "egregious discriminatory conduct." *Id.* at 969. In a dissent, Judge David S. Tatel wrote the majority's requirement of "some undefined quantum of egregiousness" for punitive damages was in conflict with the plain language in the Act allowing punitive damages for "reckless indifference" to an employee's rights. *Id.* at 971.

### C. Supreme Court Decision

The United States Supreme Court reviewed the en banc decision and, in an opinion authored by Justice Sandra Day O'Connor, agreed with the underlying holding of the en banc opinion that punitive damages are not authorized in every case in which a plaintiff prevails on liability. *Kolstad*, 527 U.S. at 534, 119 S. Ct. at 2124. Justice O'Connor also agreed that § 1981a suggested "a congressional intent of authorized punitive awards in only a subset of cases involving intentional discrimination." *Id.* In the majority's view, "Congress plainly sought to impose two standards of liability – one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *Id.* By this language, the Supreme Court interpreted § 1981a as requiring a two-tiered system in which not all plaintiffs who prevail on liability may present the issue of punitive damages to the jury.

This part of the holding then flatly rejects the approach of the D.C. Circuit's panel opinion

and the past practice of this Court in allowing the issue of punitive damages to be submitted to the jury in all cases where a plaintiff prevailed in proving intentional discrimination. However, the Supreme Court disagreed with the en banc D.C. Circuit's approach to distinguishing between those cases in which punitive damages were and were not appropriate. The Court rejected the lower court's adoption of an "egregious" standard that focused on the defendant's conduct and decided the focus should be on the state of mind or motivation of the defendant. *Id.* at 535, 119 S. Ct. at 2124.

### 1. Employer's State of Mind

The majority instructed the first issue in the punitive damages analysis is whether the employer acted "with malice or with reckless indifference to [Plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). The Court elaborated that the focus of the punitive damages inquiry should be "on the actor's state of mind," noting that in order to have the requisite mental state, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 535, 536. Although it rejected egregiousness as the standard necessary for an award of punitive damages, it acknowledged that "egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'" *Id.* at 538.

### 2. Vicarious Liability

As is the case with most Title VII actions, in *Kolstad* punitive damages were sought by the plaintiff not because of the defendant's official policy or deliberate action, but rather because of the actions of one of its employees. In other words, the plaintiff sought to hold the employer vicariously liable for the actions of an employee. The Supreme Court discussed at some length what a plaintiff must prove in such a case, instructing that once a plaintiff has shown certain individuals acted with

10

the mental state of "malice . . . or reckless indifference," the plaintiff then must impute this mental state to the defendant employer.  *Id.* at 539.  Relying on general agency principles as found in the Restatement (Second) of Agency (1957), the Supreme Court set out several instances in which an agent's unlawful discrimination would lead to the employer's vicarious liability for punitive damages:

> (a) the principal authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal was reckless in employing him, or
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
> (d) the principal or a managerial agent of the principal ratified or approved the act.

*Id.* at 542-43 (*quoting* Restatement (Second) of Agency § 217 C).  Most plaintiffs choose to pursue vicarious liability under (c), by showing "the agent was employed in a managerial capacity and was acting in the scope of employment."  *Id.*

### a.       Agent Employed in Managerial Capacity

One of the novel concepts announced in *Kolsta*d was that of the employee or agent serving in a managerial capacity, or "managerial agent."   This term was entirely new to Title VII jurisprudence.  The concept plays a central and critical role in the *Kolstad* construct, but the Court did not offer much in the way of guidance in discerning which employees qualify as managerial agents.  The Supreme Court noted "no good definition of what constitutes a managerial capacity has been found . . . and determining whether an employee meets this description requires a fact-intensive inquiry."  *Id.* at 543 (internal quotations omitted).  However, the Supreme Court did give some very limited and general instruction on this analysis:

> In making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished . . . Suffice it to say here that the examples provided in the Restatement of Torts suggest that an employee must be

important, but perhaps need not be the employer's top management, officers, or directors, to be acting in a managerial capacity.

*Id.* (internal quotations omitted).

There are two aspects of the Court's opinion here that bear careful consideration. First, the Court finds it quite instructive that the *Kolstad* Court found it could not conclude without remand whether the defendant's acting head of its Washington, D.C. office, a major office from which all of its lobbying activities emanated, was a managerial agent. The Court did, however, easily conclude the defendant's highest ranked employee, its executive director, which was one step above the acting head of the Washington, D.C. office, was acting in a "managerial capacity." This indicates even a company's high-ranking officials should not automatically be considered managerial agents. *See id.* at 546.

Second, the Court finds it significant the Supreme Court chose new terminology and did not use the term "supervisor," which is familiar to those conversant with Title VII law. A "supervisor" is someone who has the authority to take tangible employment action or to influence such action. *See Browne v. Signal Mountain Nursery*, 286 F. Supp. 2d 904, 912-18 (E.D. TN 2003) ("supervisor" is person with immediate or successively higher authority over the employee, who exercises significant control over the employee's hiring, firing, or conditions of employment). The Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), discussed that term at length, so the Court concludes that the Supreme Court meant something other than "supervisor" in deciding on the terminology "managerial agent" in *Kolstad*.

### b. Acting in the Scope of Employment

The Supreme Court also recognized that for vicarious liability to attach, the managerial agent must act within the scope of his employment. This is a concept familiar in agency law. However,

12

the Court acknowledged applying this general agency principle would render a great number of employers potentially liable. This caused the Court some concern:

> The Restatement of Agency provides that even intentional torts are within the scope of an agent's employment if the conduct is "the kind [the employee] is employed to perform," "occurs substantially within the authorized time and space limits," and "is actuated, at least in part, by a purpose to serve the" employer. Restatement ( Second) of Agency, § 228(1), at 504. According to the Restatement, so long as these rules are satisfied, an employee may be said to act within the scope of employment even if the employee engages in acts "specifically forbidden" by the employer and uses "forbidden means of accomplishing results." *Id.,* § 230, at 511, Comment *b; see also Burlington Industries, Inc.,* 524 U.S., at 756, 118 S.Ct. 2257; Keeton, Torts § 70. On this view, even an employer who makes every effort to comply with Title VII would be held liable for the discriminatory acts of agents acting in a "managerial capacity."

*Kolstad*, 527 U.S. at 543-44. The Court found the general agency principle of vicarious liability for all actions within the scope of the agent's employment to be in conflict with one of the underlying objectives of Title VII, encouraging employers "to detect and deter Title VII violations." *Id.* at 544, 545.

### c. Good Faith Efforts to Comply with Title VII

Because of its concern with the overly broad reach of the scope of employment rule and the resulting unfairness to employers who make sincere efforts to comply with Title VII, the Court decided to impose limitations on the availability of punitive damages in vicarious liability cases. The Court reasoned, "[w]here an employer has undertaken such good faith efforts at Title VII compliance, it demonstrates that it never acted in reckless disregard of federally protected rights." *Id.* at 544 (internal quotations omitted). Thus, the Court held, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545 (internal quotations omitted). The relevant inquiry into these good faith efforts may

13

include "whether the [defendant] had been making good faith efforts to *enforce* an antidiscrimination policy." *Id.* at 546 (emphasis added).

## VII.   SIXTH CIRCUIT POST-*KOLSTAD* CASE LAW

The Sixth Circuit has had only a few occasions to issue opinions following *Kolstad*. Therefore, many issues of first impression remain for this Court to decide in proceeding in its analysis of Plaintiff's punitive damages claim. The Court here will briefly summarize the Sixth Circuit's decisions analyzing *Kolstad*.

The most recent case is *White v. Burlington North & Santa Fe Railway Company*, 364 F.3d 789 (6th Cir. 2004) (en banc). In *White,* the Sixth Circuit determined that since § 1981a is silent on the evidentiary standard for punitive damages, the appropriate standard is not clear and convincing evidence, as the district court had instructed, but by a preponderance of the evidence.[4] *Id.* at 805. The court further found it could not determine on the record before it whether the plaintiff had presented sufficient evidence to submit the issue of punitive damages to the jury. It therefore remanded the case for the district court to decide whether a new trial on punitive damages was appropriate. *Id.* at 808.

The next most recent case is *Hall v. Consolidated Freightways Corporation of Delaware*, 337 F.3d 669 (6th Cir. 2003). In that case, the defendant appealed the trial court's denial of its motion for judgment as a matter of law with regard to punitive damages, and the Sixth Circuit panel upheld the jury's punitive damages award. The Sixth Circuit then adopted the United States Court

---

[4]The preponderance of the evidence standard was always the standard applied by the Court in Title VII punitive damages issues even before *Kolstad*.

14

of Appeals for the Seventh Circuit's ("Seventh Circuit") analytical structure for punitive damages. *Id*. at 675-76 n.2. The Seventh Circuit has set out two ways plaintiffs can prove the requisite mental state:

> A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws [but discriminated despite this knowledge]. A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions.

*Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001) (adopting second means of proving mental state from *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir. 2000)). The Sixth Circuit held "diametrically opposed testimony" from the parties' witnesses "provides support for the conclusion that [the d]efendant's employees were not truthful in their actions," thus the plaintiff had satisfied the mental state element. *Hall*, 337 F.3d at 675. The court did not discuss the vicarious liability elements of a punitive damages claim, but did adopt the *Bruso* court's analysis of an employer's good faith efforts: "[I]t is not enough that the employer have a written or formal anti-discrimination policy . . . Rather, the employer must demonstrate that it engaged in good faith efforts to *implement* the policy." *Id.* (internal citations omitted) (emphasis in original). The court found the defendant could not show it implemented its antidiscrimination policy since it did not enforce the policy for four years despite numerous incidents of racial animus and did not implement the policy with the same force to race as it did to sex. Thus, the district court's denial of the defendant's motion for judgment as a matter of law with regard to punitive damages was not in error.

An earlier, unpublished decision, *Jeffries v. Wal-Mart Stores, Inc.*, 15 Fed. Appx. 252 (6th Cir. 2001), provides some guidance about what "egregious or outrageous acts may serve as evidence

supporting an inference of the requisite 'evil motive.'" *Kolstad*, 527 U.S. at 538. That court found

a jury could conclude the employer had "engaged in a pattern of calculated retaliatory conduct so

egregious as to be in reckless disregard of [the plaintiff's] right to be free from retaliation" where

> . . . after cleaning out [plaintiff's] office, reducing her responsibilities, becoming harassingly unsupportive, and effectively forcing her to transfer to the jewelry department, managers used an undeserved written reprimand for arguably appropriate behavior ([plaintiff]'s circulating a petition) and the previous retaliatory forced transfer as pretexts to prevent [plaintiff]'s long-sought advancement even when the candidates who were actually promoted were two people with no personnel management experience at all, one of whom was a recent hire promoted in violation of Wal-Mart's own six-month rule. All of this occurred despite [plaintiff]'s repeated protestations and with the actual or tacit approval of [the district manager] and, to a certain extent, [the regional manager.]

*Jeffries*, 15 Fed. Appx. at 264-65. The court further evaluated the defendant's vicarious liability and

found, without analysis, the record contained evidence Wal-Mart store managers would be

"sufficiently important" to be managerial agents under *Kolstad*. The Court also found higher-up

managerial agents had ratified or approved the discrimination by store managers, an alternative

method of imputing liability to the employer. *Id.* at 265-66.

## VIII.   OTHER CIRCUITS' POST-*KOLSTAD* CASELAW

The Court will not attempt to sort through all the decisions of the other courts of appeal.

Much of this caselaw lacks analysis and treats issues in cursory fashion, and the analysis the cases

do contain tends to be fact-intensive. However, the Court will canvass some of those decisions to

give a flavor of the varying approaches those courts have taken, as well as the conflicts.

### A.   Mental State

The courts of appeal have approached the analysis of the mental state element in a variety

of manners. In general, courts have found this element met where the plaintiff shows the supervisors

involved in the decision at issue had antidiscrimination training or even very general knowledge about antidiscrimination laws or an employer's antidiscrimination policies. *See, e.g.*, *Medcalf v. Trs. of Univ. of Pa.*, 71 Fed. Appx. 924, 932-33 (3d Cir. 2003) (manager knew employer had equal opportunity employment policy prohibiting taking gender into account in hiring); *Walsh v. Nat'l Computer Sys.*, 332 F.3d 1150, 1161 (8th Cir. 2003) (one supervisor had received training on employer's nondiscrimination policies and understood sexual harassment included discriminating against a woman for being pregnant; another supervisor testified about the company's anti-discrimination policy with regards to pregnant women; and a third supervisor testified he would "take very seriously a complaint that a manager was making derogatory remarks about people getting or possibly being pregnant"); *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002) (manager testified he had seen, although not read, an Equal Employment Opportunity Commission ("EEOC") poster detailing unlawful sexual harassment; this "suggested at least a rudimentary knowledge of [the poster's] import"); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 662-63 (7th Cir. 2001) (supervisors knew about employer's sexual harassment policy and told harassing employee his actions were "inappropriate," "offensive," and "incorrect behavior in the workplace," permitting inference supervisors believed they were "inappropriate" and "incorrect" because they were illegal); *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001) ("training in 'equal opportunity' may now fairly be understood to convey some awareness of Title VII requirements"; supervisor testified he was "exposed to 'human resources training' and training on 'hiring practices and equal opportunity,'" even though federal antidiscrimination laws were not explicitly discussed); *Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001) (one of the "major players" in plaintiff's demotion attended at least three training sessions on sexual harassment and discrimination; another

testified he discussed the employer's "zero-tolerance-for-discrimination policy" with supervisors on more than one occasion; and a third, the employer's senior litigation counsel, was responsible for employee training and education on Title VII and the employer's antidiscrimination policies); *Romano v. U-Haul Int'l,* 233 F.3d 655, 669 (1st Cir. 2000) ("ample" evidence of requisite mental state where plaintiff's supervisor apologized and told plaintiff he believed his supervisor's termination of her was solely because of her sex, and supervisor who terminated plaintiff knew about employer's antidiscrimination policies); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443-47 (4th Cir. 2000) (employer required every member of management, including the supervisors at issue, to attend week-long seminar including education on federal anti-discrimination laws); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1246 (10th Cir. 1999) (in Americans with Disabilities Act ("ADA") case decided in accordance with *Kolstad*, manager testified he was familiar with ADA's accommodation requirements and antidiscrimination provisions).

Other circuits have focused on the egregiousness of the defendant's actions as evidence of the requisite mental state. *See, e.g.*, *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1003-1004, 1009-1010 (8th Cir. 2000) (manager's behavior was "'sufficiently abusive' to manifest the requisite malice of disregard" where manager made unwelcome physical and verbal sexual advances toward plaintiff and took an inappropriate interest in her personal life, then mistreated the plaintiff on the job when she rebuffed his advances); *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 515-16 (9th Cir. 2000) (jury could conclude defense witnesses lied, both to the plaintiff and at trial, "as part of a continuing effort to cover up their campaign against her" and jury could infer from this the defendant could not have reasonably believed that its conduct was lawful); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 280, 286 (5th Cir. 1999) (manager

18

told Caucasian plaintiff she would "never move up with the company being associated with a black man," then "pursued a series of pretextual disciplinary actions" against her, finally firing her on "fabricated" grounds).

Two circuits have held the mental state is met simply by a plaintiff's success on a claim the employer retaliated against her for filing a complaint of discrimination. *See Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 406 (5th Cir. 2000) (in retaliation action where employee filed complaints with the EEOC, court held such retaliation alone "indicates a healthy disdain for [plaintiff's] right to seek redress in courts . . ."); *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir. 2002) (in ADA retaliation action where employee filed complaints with the EEOC, supervisor testified he had received training on the ADA and made the statement "he was going to teach [plaintiff] a lesson" either not to file EEOC charges or not to protest work assignments that exceeded his medical restrictions).

Additionally, two circuits have held failure to respond to an employee's complaints of discrimination can satisfy the mental state requirement. *See MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004) (human resources manager failed to respond to employee's complaints, "such behavior sufficiently shows apathy by higher-level executives toward protecting employees' Title VII rights"); *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002) (harassing supervisor responded to plaintiff's complaints about his unquestionably inappropriate sexual comments to her by saying she "'might as well get used to it' because 'that was the way of [defendant]").

Finally, the Fourth Circuit recently imputed the requisite mental state to partners in a "prominent law firm" simply because of their membership therein and the fact that their office

19

contained an employment law section. *See Gallina v. Mintz*, 123 Fed. Appx. 558, 564 (4th Cir. 2005). The Fourth Circuit in that case also found the requisite mental state was particularly clear for one managing partner who actually practiced employment law and was aware of, but did not address, the plaintiff's complaints of discrimination. *Id.*

### B. Managerial Capacity

The courts of appeal also have focused on varying factors in the managerial capacity analysis. Some courts have focused solely on the discriminating employee's job title or place in the employer's hierarchy, without any further analysis. *See, e.g., Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 516 (9th Cir. 2000) (remanded for determination of managerial capacity where record was unclear "how high up in [defendant's] corporate structure" the employees were, which the court described as "crucial to the outcome"); *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir. 2002) (manager of Chrysler parts distribution center was serving in a managerial capacity); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 548 n. 4 (4th Cir. 2003) ("there can be no real dispute" a medical facility's director of human services, director of human resources, and manager in charge of nurse hiring "qualified as 'managerial agents' under *Kolstad*"); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004) (plaintiff's immediate supervisor was acting in a managerial capacity in failing to promote plaintiff; defendant's human resources manager also was acting in a managerial capacity).

Other courts of appeal have focused on the discriminating employee's authority to hire, fire, promote, or discipline the plaintiff. Where the discriminating employee had the authority to take the adverse employment action at issue in the case, the circuits that have addressed the issue have determined the discriminating employee acted in a managerial capacity. *See, e.g., Anderson v.*

20

*G.D.C., Inc.*, 281 F.3d 452, 461 (4th Cir. 2002) (general manager and dispatcher for trucking company "was unquestionably a managerial employee" where he had the authority to hire and fire drivers and impose discipline, such as docking wages); *Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001) (general manager of United Airlines' operations at O'Hare airport was acting in a managerial capacity since he oversaw all United employees at that airport and was authorized to demote employees; defendant's senior litigation counsel was acting in a managerial capacity since she advised defendant on labor and employment issues, conducted training and produced literature for employees on harassment and discrimination, and had been given the authority to review the events in the case at hand and make the final decision whether to rescind the plaintiff's demotion); *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 663 (7th Cir. 2001) (plant manager was a managerial agent since he acted as general manager for the defendant's U.S. operations, hired staff for the plant, and had authority to discipline and terminate employees who worked directly or indirectly for him); *Madison v. IBP, Inc.*, 257 F.3d 780, 795 (8th Cir. 2001) (meatpacking plant personnel director and plant manager both acted in a managerial capacity where they had authority to terminate employees), overruled in part on other grounds by *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 444 (4th Cir. 2000) (one supervisor acted in a managerial capacity where she managed a department of 23 recruiters and was given authority to hire recruiters in her sole discretion and organize her department any way she wished; another supervisor, manager of the customer service mail department, acted in a managerial capacity since he managed approximately 45 supervisors, assistant supervisors, and employees and had authority to make personnel decisions without guidelines, review, objective criteria, or accountability); *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218

21

F.3d 392, 406 (5th Cir. 2000) (dean of university's engineering department acted in a managerial capacity in refusing to grant the plaintiff a pay raise since he ultimately was responsible for pay-raise decisions); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 285 (5th Cir. 1999) (district manager was acting in managerial capacity where he had authority to make personnel decisions regarding employees in certain departments within stores he supervised).

However, the circuits are not in agreement where an employee has some say in employment decisions but does not have the authority to act as the ultimate decisionmaker for hiring, firing, promotions, or discipline. *Compare, e.g., Medcalf v. Trs. of Univ. of Pa.*, 71 Fed. Appx. 924, 926, 932 (3d Cir. 2003) (senior associate athletic director "clearly" acted in managerial capacity where she was placed in charge of conducting the search for a new coach "as she saw fit," although she did not have the ultimate responsibility for the hiring decision); *Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001) (defendant United Airlines' manager of cabin service for United Airlines at O'Hare Airport was acting in a managerial capacity, since he oversaw seven supervisors, each of whom supervised up to 125 employees, assigned work to employees, and had authority to mediate disputes and investigate claims of discrimination or harassment, although he could not demote or fire without approval); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000) (district manager, store manager plaintiff's immediate supervisor, acted in a managerial capacity where he supervised several stores and possessed authority to schedule and conduct employee performance evaluation, and thereby effectuate or stall employee raises, although he had no hiring or firing authority); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1247 (10th Cir. 1999) (in ADA case decided in accordance with *Kolstad*, Wal-Mart assistant store manager acted in managerial capacity where he had independent authority to suspend subordinates but only make hiring and firing

recommendations; store manager also acted in managerial capacity where he had responsibility for hiring and firing decisions) *with, e.g., Hertzberg v. SRAM Corp.*, 261 F.3d 651, 663 (7th Cir. 2001) (plaintiff's immediate supervisor was not managerial agent where testimony indicated he had little discretion in hiring, disciplining, or terminating employees who reported to him and no authority to terminate employees without his supervisor's approval); *Williams v. Trader Publ'g Co.,* 218 F.3d 481, 487, n. 4 (5th Cir. 2000) (plaintiff's supervisor, full-time general manager of defendant's Houston office whom court characterized as a "line supervisor," did not act in a managerial capacity because he had no authority to take the adverse action at issue, termination, against the plaintiff who was a member of management, even though he could terminate employees for blatant misconduct, such as on-the-job drunkenness).

### C. Good Faith Efforts to Comply with Title VII

A major issue on which the courts of appeals are split is their interpretation of the good faith efforts element. The First, Second, and Ninth Circuits have held this is an affirmative defense to punitive damages and required the defendant to bear the burden of proving its good faith efforts to comply with Title VII. *See Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000), *cert. denied*, 534 U.S. 815, 122 S. Ct. 41, 151 L. Ed. 2d 14 (2001); *Zimmermann v. Assocs. First Capital Corp*., 251 F.3d 376, 385 (2d Cir. 2001); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000). Four other circuits have referred to this simply as a defense, without any discussion of who bears the burden. *See Lust v. Sealy, Inc.*, 383 F.3d 580, 589-90 (7th Cir. 2004); *Davey v. Lockheed Martin Corp*., 301 F.3d 1204, 1209 (10th Cir. 2002) (noting the Tenth Circuit has not decided whether *Kolstad* creates an affirmative defense on which the defendant bears the burden of proof, without adopting affirmative defense view); *Miller v. Kenworth of Dothan Inc.*,

23

277 F.3d 1269, 1280 (11th Cir. 2002); *Deffenbaugh-WIlliams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999). Two circuits have stated good faith efforts provide an "exception" to vicarious liability. *See Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1009 (8th Cir. 2000), *but see Madison v. IBP, Inc.*, 330 F.3d 1051, 1060 n.5 (8th Cir. 2003) (mentioning, without analysis, "good faith defense"); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 445 (4th Cir. 2000). The Third and Sixth Circuits have not commented on this issue.

Other than their disagreement on the characterization of the good faith efforts prong, the courts of appeal have approached this analysis in much the same way, focusing on the implementation, rather than the mere existence, of any antidiscrimination policy. However, the circuits are not in agreement in the breadth of their evaluation of the employer's antidiscrimination efforts. Some circuits concentrate only on the facts relevant to the plaintiff's case at hand. *See, e.g., Hertzberg v. SRAM Corp.*, 261 F.3d 651, 663-664 (7th Cir. 2001) (employer did not make good faith efforts to implement its sexual harassment policy where record contained evidence plaintiff complained about gender-based harassment to her immediate supervisor, who told her she was being "too emotional," and to the manager of the plant where she worked, who "seemed to shrug it off" and did not follow company policy of putting her complaints in writing); *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1009 (8th Cir. 2000) (jury award of punitive damages upheld where employer submitted evidence of its written sexual harassment policy and policy of encouraging employees with grievances to contact the home office, but plaintiff showed the company minimized her complaints of sexual harassment, performed a cursory investigation that focused on her performance rather than the harasser's behavior, and forced her to resign rather than discipline the harasser); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000) (employer's claims of strong

antidiscrimination policy and monthly employee training on its policy and relevant statutes as good

faith efforts to comply with Title VII contradicted by employee testimony including clearly incorrect

ideas of what constitutes sexual harassment, testimony no such training actually took place, and

evidence in the record showing employer knew plaintiff was being sexually harassed but failed to

take any action to stop it); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th

Cir. 1999) (employer's evidence of good faith efforts was insufficient to defeat punitive damages

where employer merely represented it encouraged employees to contact higher management with

grievances, but plaintiff presented substantial evidence employer failed to respond to her complaints

about her manager's racial animus).

Other circuits assess the employer's practices as a whole, including any prevention of and

response to, or lack thereof, other claims of discrimination not involving the plaintiff or the case at

hand. *See, e.g., Madison v. IBP, Inc.*, 257 F.3d 780, 795-796 (8th Cir. 2001) (although employer

had a corporate policy prohibiting racial and sexual discrimination and harassment and put on an

annual two-hour training session for plant managers on the "Legal Aspects of Supervision," record

contained evidence these policies were not carried out at the plant at issue, where management did

not investigate or remedy a substantial number of complaints of civil rights violations, failed to

record reprimands for harassing conduct in employees' personnel files, and maintained policies that

punished harassment victims by telling an alleged harasser the identity of a complainant and putting

"counseling for sexual harassment" notations in the personnel files of any complaining employee),

overruled on other grounds by *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004); *Romano

v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000) (jury's award of punitive damages upheld where

employer, although it put forth evidence it distributed materials and instructed managers regarding

nondiscriminatory hiring and termination policies, did not show it had any active mechanism for renewing employees' awareness of these policies and did not present examples showing antidiscrimination policies actually were followed); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 445 (4th Cir. 2000) (jury award of punitive damages affirmed although employer had disseminated antidiscrimination policy through posters, its employee handbook, and some training and allegedly had three avenues available for employees to complain about discrimination, since plaintiff showed two top executives harbored racial animosity toward minorities, buried internal reports showing the employer had a negative attitude against minorities, and took no action to remedy these issues; employees feared retaliation if they used any of the three avenues to complain about discrimination; and the employer had a subjective, unstructured promotional system instituted by one of the executives who harbored racial animosity toward minorities).

## IX.   ANALYSIS

With the above background and review of courts of appeal cases in mind, the Court will now offer its interpretation of what *Kolstad* requires before the Court submits the issue of punitive damages to a jury.  The Court is hopeful this guidance will be of benefit to the parties in their preparation for and presentation in any subsequent litigation in this case.  Mindful of the Supreme Court's rejection of the Court's earlier practice, the Court has interpreted the holding in *Kolstad* with the following question always in mind: Does this interpretation comply with a two-tiered system that limits punitive damages to a subset of cases, or does it return the Court to the now-rejected system in which all cases of intentional discrimination qualify for punitive damages?  If the result of an

interpretation is a return to pre-*Kolstad* practice, then that interpretation is necessarily faulty.[5]

The Court notes at the outset of its analysis Plaintiff and Defendants spent considerable effort in their briefs pointing to evidence introduced to establish or counter liability and compensatory damages during the trial. The problem with this is that evidence says little or nothing about the *Kolstad* requirements the Court has set out above. The only additional evidence, not introduced at trial, of which the parties have informed the Court is information regarding the net worth of Defendants. As will be explained in considerable detail below, such evidence plays no role in the Court's determination of whether this is an appropriate case for punitive damages. In order for the Court to perform its gatekeeper role, the Court must be informed of what evidence the parties propose they could present to the jury on punitive damages. Once the Court is informed of that evidence, and the opposing side has had a chance to comment on or counter that evidence, the Court will be in a position to decide whether Plaintiff has sufficient evidence from which a reasonable juror could find in her favor on all the elements of punitive damages.

A.      The Court's Gatekeeper Function

The Court interprets the *Kolstad* decision as requiring a gatekeeper function for the district court. It is of particular significance the Supreme Court stated punitive damages are available only to a "subset of cases involving intentional discrimination." *Kolstad*, 527 U.S. at 534. The Court went on to hold that § 1981a establishes a two-tiered system, in which a higher standard must be

_____

[5]This simple test forces the Court to reject the superficially appealing argument that the only change *Kolstad* made to Title VII punitive damages jurisprudence was to add an affirmative defense that the defendant must show good faith efforts to comply with Title VII and this affirmative defense acts as the winnowing mechanism to separate out the cases suitable for punitive damages from those not suitable. Accepting this argument would mean all cases qualify for punitive damages and would have to be submitted to the jury.

satisfied for punitive damages than that sufficient for liability. *Id.* The Sixth Circuit in *White* also, in somewhat different language, reiterated that punitive damages are only appropriate in a subset of Title VII cases:

> Unquestionably, punitive damages serve a different purpose than compensatory damages. The requirement that punitive damages be awarded only when a defendant acts maliciously or recklessly recognizes this difference in purpose and ensures that punitive damages will be awarded only in the most egregious cases.

*White*, 364 F.3d at 806. This language supports the notion trial courts must perform a gatekeeping function.

Because punitive damages are not available in every case, in order to perform its gatekeeping function, the Court must make a preliminary finding the plaintiff may be able to meet the higher showing required for punitive damages before the jury may consider whether to award them. *See generally Kolstad*, 527 U.S. at 534; *see also White,* 364 F.3d at 808 (after holding district court erred in jury instruction on evidentiary standard, case remanded with instruction, "[i]f the district court determines on remand that the evidence is sufficient to support a claim for punitive damages under the standard announced by the Supreme Court in *Kolstad***,** then the district court should conduct a new trial on the issue of punitive damages only").

The Court believes this interpretation complies with its earlier stated test and is consistent with *Kolstad*. If the district courts did not act as gatekeepers, then every Title VII case in which a plaintiff prevails would be submitted to the jury for punitive damages, which would clearly be in conflict with the two-tiered system endorsed in *Kolstad*. *See* 527 U.S. at 534.

### B. Plaintiff Bears Burden of Demonstrating Requisite Mental State

Section 1981a makes clear the plaintiff bears the burden of proving the employer acted with the requisite mental state:

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1). Further, the Sixth Circuit has determined, since the statute is silent on the evidentiary standard for this showing, the appropriate standard is by the preponderance of the evidence. *White,* 364 F.3d at 805.

The Supreme Court in *Kolstad* instructed that the focus of the punitive damages inquiry should be "on the actor's state of mind." 527 U.S. at 535. Thus, the first question for the Court to determine is whether the employer acted "with malice or with reckless indifference to [Plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). The Supreme Court noted in order to have the requisite mental state, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad,* 527 U.S. at 536. In addition, "egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'" *Id.* at 538.

As noted herein, the Sixth Circuit recently adopted the Seventh Circuit's analytical structure for punitive damages. *See Hall,* 337 F.3d at 675-76, n.2. Under this structure, a plaintiff may prove the requisite mental state in one of two ways:

A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws [but discriminated despite this knowledge]. A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions.

*Bruso*, 239 F.3d at 858.

Typically, evidence on the mental state prong will focus on the discriminating employee's

29

training on antidiscrimination laws and company policies, showing the employee knew his or her discriminatory conduct was prohibited, or the egregiousness of the employer's actions as evidence of the mental state. *See, e.g.*, *Jeffries*, 15 Fed. Appx. 252; cases discussed *supra* at 16-20, Section VIII.A.

Regarding the second means of establishing the requisite mental state, the Court would note the reason the *Bruso* court held that lying to the jury to cover up discriminatory actions satisfies this element is a defendant would not attempt to "cover up" its actions unless it had some knowledge those actions violated the plaintiff's federally protected rights. Therefore, the Court interprets this manner of proving the requisite mental state narrowly. While admittedly there will be circumstances where a defendant's pretrial or trial conduct is evidence of the requisite mental state (for example, a defendant may destroy incriminating evidence required to be provided pursuant to discovery or a top official may order subordinates to lie), in cases where there is merely the typical conflict between witnesses, this is unlikely to constitute evidence of the requisite mental state. For a Title VII case to proceed to trial, there must be some dispute regarding the facts. If there were complete agreement on all the facts, then the case likely would be settled before trial by the parties or the trial judge could dispose of the case through summary judgment or other pre-trial means. Thus, in the garden-variety Title VII case, the mere fact the jury, in finding for the plaintiff on liability, must have accepted the plaintiff's version of the story and rejected the defendant's version cannot constitute proof of malice or reckless indifference to the plaintiff's federally protected rights. If that were the case then we would return to the pre-*Kolstad* system, since in every Title VII case where witnesses give conflicting versions of the facts and a plaintiff prevails on liability, the issue of punitive damages would be submitted to the jury.

As a final note, it is worth commenting on the examples provided in the *Kolstad* opinion in which intentional discrimination would not give rise to punitive damages because the mental state would not be met:

> In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability. *See, e.g.*, 42 U.S.C. § 2000e-2(e)(1) (setting out Title VII defense "where religion, sex, or national origin is a bona fide occupational qualification"); *see also* § 12113 (setting out defenses under ADA).

*Kolstad*, 527 U.S. at 536-37. These examples provide some help in cases where the scope of Title VII is applied to novel classes or situations. However, in the typical case that comes before the district courts in today's employment world, it is extremely unlikely the employer will be unaware of the requirements of Title VII.[6] Considering the length of time Title VII has been law and the general awareness of the antidiscrimination laws in American society, it would be rare indeed for an employer to be unaware of the prohibition against employment discrimination. Thus, showing the requisite intent should be relatively easy in the current employment environment, in which most companies of any size conduct antidiscrimination training, have written employee handbooks containing antidiscrimination policies, and at least inform their employees about what behavior would violate federal antidiscrimination laws. This element, then, will not distinguish between the *Kolstad* two-tiered system and the rejected system the Court used previously. However, since this is an element specifically addressed in *Kolstad*, the Court must incorporate it into its analysis, but

---

[6]The Court acknowledges there may be grey areas on the edges of Title VII jurisprudence. However, in the vast majority of Title VII cases, the law will be clearly established.

finds it often will be an easy element for a plaintiff to meet.

### C. Plaintiff Bears Burden of Imputing Liability to Defendant

As the Court has noted, the *Kolstad* Court set out four methods of imputing liability to an employer for an employee's misconduct:

(a) the principal authorized the doing and the manner of the act, or
(b) the agent was unfit and the principal was reckless in employing him, or
(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
(d) the principal or a managerial agent of the principal ratified or approved the act.

527 U.S. at 542-43 (*quoting* Restatement (Second) of Agency § 217 C)) ("Restatement of Agency").

In this case the most relevant of these appears to be (c), "the agent was employed in a managerial capacity and was acting in the scope of employment." There has been no allegation Defendants directly authorized illegal discrimination against Plaintiff, that Koepsel was unfit and that Defendants were reckless in employing him, or that Defendants ratified or approved Koepsel's illegal discrimination against Plaintiff. However, should Plaintiff seek to proceed under one of these other methods of imputing liability, the Court would consider such other forms of vicarious liability if there are facts that would support them.

Before proceeding with its analysis of the third method of imputing liability, the Court will make some general observations about the four Restatement of Agency examples. These observations may assist in a better understanding of which employees would qualify as a managerial agent. The first two examples refer to actions or conduct of the *principal*. In the first, the principal authorized the act, and in the second, the principal was reckless in employing the unfit wrongdoer. In the fourth example, however, the principal *or managerial agent* ratified or approved the act. The word "ratify" is defined as: "to approve and sanction esp. formally (as the act of an agent or servant);

32

make (as a treaty) valid or legally operative; confirm." *Webster's Third New International Dictionary of the English Language* (Unabridged) 1885 (Merriam-Webster Inc. 1993). In light of this definition, the fourth Restatement of Agency example, then, implies the managerial agent has the same authority as the principal to formally or legally approve or sanction the action of a lower-level employee. This suggests the managerial agent must be at a very important level. In the typical corporate structure, members of the Board of Directors, the President or Chief Executive Officer, the Chief Operations Officer, and certain other high officials would meet this description; that is, they have the general authority to formally or legally approve actions of subordinates. Clearly not every "supervisor" (*i.e.*, a person with immediate or successively higher authority over an employee or who exercises significant control over the employee's hiring, firing, or conditions of employment, *see Browne*, 286 F. Supp. 2d at 912-18), possesses the authority to formally or legally approve or sanction the actions of lower-level employees. In some respects, examples (a), (b), and (d) in the Restatement of Agency suggest persons of such authority that they are closely identified with the principal. In other words, when they speak or act with regard to a corporate matter, their words or actions are deemed by reasonable people as the words or acts of the corporation. Again, this would describe important or high-level employees.

The same managerial agent or capacity terminology is used in the third Restatement of Agency example, at issue in most punitive damages cases, in which a managerial agent acts within the scope of his employment. There is no reason to adopt an understanding or definition of managerial agent in example three that is different from that outlined above in example four, and every reason to use the same definition. This analysis should inform the Court's analysis of whether an employee was employed in a managerial capacity in example three.

## 1.    Managerial Capacity

Although the Supreme Court in *Kolstad* noted "no good definition of what constitutes a managerial capacity has been found . . . and determining whether an employee meets this description requires a fact-intensive inquiry," it gave the following guidance:

> In making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished . . . Suffice it to say here that the examples provided in the Restatement of Torts suggest that an employee must be important, but perhaps need not be the employer's top management, officers, or directors, to be acting in a managerial capacity.

*Id.* at 543 (internal quotations omitted). Thus, in making this determination, the Court must consider not just the discriminating employee's level in management but also inquire into "the type of authority that the employer has given to the employee [and] the amount of discretion that the employee has in what is done and how it is accomplished." *Id.* The Court finds it instructive that the Court in *Kolstad* cited Illustration 3 from the vicarious liability section of the Restatement (Second) of Torts ("Restatement of Torts") in discussing the managerial capacity element. *See id.* That Illustration indicates punitive damages are proper against a corporation owning a series of retail stores where an operations manager who supervises the management of that series of retail stores commits a tort. Restatement (Second) of Torts § 909, Illus. 3 (1979). The Court also is instructed by the *Kolstad* Court's remand of the case for the district court to determine whether the acting head of the defendant's Washington, D.C. office was acting in a managerial capacity, as discussed *supra*. *See Kolstad*, 527 U.S. at 546.

Using the scant guidance given by the *Kolstad* Court, the Court finds that where an employee fits within the employer's hierarchy will be particularly relevant in this analysis; the higher in the hierarchy, the more likely the employee is a managerial agent, and vice versa. However, based on

34

the Illustration cited by the Supreme Court and its remand for a determination of whether the head of a major office was acting in a managerial capacity, *see id.* at 543, 546, the Court finds it must look behind an employee's title to determine whether he or she was acting in a managerial capacity. This necessarily will be a fact-intensive inquiry. *See id.* at 543. Under the test guiding this Court's analysis, this interpretation is a significant departure from the rejected system the Court used previously, in which an employee's level in the corporate hierarchy was not expressly examined in the punitive damages analysis. By closely examining the facts surrounding an employee's actions and limiting the group of employees whose actions can give rise to vicarious liability for punitive damages to those who are "important, but perhaps need not be the employer's top management, officers, or directors," *id.* at 543, the Court will be restricting punitive damages to far fewer cases than under the rejected system.

The Court is aware this approach differs significantly from that taken by most of the circuits which, in cases involving a discriminator other than a very high-ranking employee, have focused on the employee's ability to make employment decisions regarding the plaintiff (*see* previous discussion). Such an approach practically guarantees anyone who would qualify as a supervisor, as defined in *Faragher*, would be acting in a managerial capacity when he or she makes an employment decision. This would encompass far too many employees to comport with the two-tiered system *Kolstad* envisions, thus the Court must reject it.

Moreover, the Court assumes there was some purpose in Justice O'Connor rejecting the use of the word "supervisor" and instead selecting "managerial agent" in *Kolstad*. If anyone with the ability to make employment decisions is a managerial agent, then a managerial agent is synonymous with a supervisor, and the distinct term "managerial agent" serves no purpose. If that were so, the

Court in *Kolstad* would have had no reason to rely on the four examples drawn from the Restatement of Agency. Assuming Justice O'Connor had some purpose in her choice of the terminology "managerial agent," that term must mean something other than "supervisor." Logically, that could mean either someone with less authority or more authority than a supervisor. Considering the four examples from the Restatement of Agency and the language of *Kolstad*, the Court is compelled to conclude a managerial agent must possess more authority than a supervisor.

2. **Plaintiff Bears Burden of Demonstrating Defendant's Employee Was Acting Within Scope of Employment**

A plaintiff should have a relatively easy task of demonstrating the managerial agent was acting within the scope of employment. As the *Kolstad* majority acknowledged, the law in the field of agency provides that even if an agent acts in violation of his principle's policy, the agent may still be acting within the scope of employment. 527 U.S. at 543-44. In most cases, demonstrating the adverse employment action taken was within the agent's authority and took place during working hours at the work site will suffice. *Id.*; *see also* Restatement (Second) of Agency § 228(1) (1958).

This then will not distinguish Title VII cases from the pre-*Kolstad* system. Therefore, this segment fails the Court's test, but this interpretation is compelled by well-settled agency law. To winnow out the cases in compliance with a two-tiered system, then, will require reliance on the other factors.

3. **Plaintiff Bears Ultimate Burden of Demonstrating Defendant Did Not Engage in Good Faith Efforts to Comply With Title VII**

Along with the managerial agent portion of the analysis, this part of the analysis has been the subject of most dispute and debate among the district and circuit courts. There are several

36

subsidiary issues involved here: (1) whether the plaintiff or defendant bears the burden on this issue; (2) whether this is a defense or something else; (3) if this is a defense, whether it is one that must simply be raised in order to be asserted or is an affirmative defense; (4) if this is a defense or an affirmative defense, how the courts can perform their gatekeeping function; and (5) whether the focus should be on the employer's overall good faith efforts or on what happened to the particular plaintiff before the court. The Court will not address all of these many issues even though it recognizes they have not been resolved definitively. The Court will address only those that it must in this case.

In *Kolstad* the Court held, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." 527 U.S. at 545 (internal quotations omitted). In remanding the case to the district court, the Supreme Court stated "[i]t may also be necessary to determine whether the [defendant] had been making good faith efforts to *enforce* an antidiscrimination policy." *Id.* at 546 (emphasis added). The Court gave no guidance as to the issues the Court listed above.

The Court's review of decisions of the courts of appeal reveals confusion and splits in their interpretation of this portion of *Kolstad*. The Sixth Circuit is among the circuits that have not weighed in on this issue.[7] One district court within the Sixth Circuit has analyzed the good faith

_____

[7]Although Plaintiff in her brief asserts the burden shifts to the employer on the good faith efforts inquiry, citing *Hall* for this proposition (Court File No. 93, pp. 2, 8), the *Hall* court made no such statement. The Sixth Circuit in *Hall* merely stated,

. . . for any employer to show that it engaged in good faith efforts so as to avoid liability for punitive damages, it is not enough that the employer have a written or formal anti-discrimination policy. [ ] Rather, the employer must demonstrate that it

37

efforts element as an affirmative defense. *See Reed v. Cracker Barrel Old Country Store*, 171 F. Supp. 2d 741, 747-48 (M.D. Tenn. 2001). This Court cannot agree with the Middle District of Tennessee in its conclusion, which it reached without analysis after merely cataloging the approaches of other circuits. The Supreme Court knows full well how to create an affirmative defense when it so chooses; in fact, it did so just one year prior to *Kolstad*. In *Faragher*, the Court stated, "[w]e hold that an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an **affirmative defense** looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." 524 U.S. at 780 (emphasis added). The *Kolstad* Court did not couch its discussion of an employer's good faith efforts to comply with Title VII in terms of an affirmative defense, it simply stated "an employer **may not be vicariously liable** for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." 527 U.S. at 545 (internal quotations omitted) (emphasis added).

An added difficulty with concluding *Kolstad* mandates an affirmative defense is the inability of the district courts to act as gatekeepers. The traditional tools district courts use to screen cases

---

engaged in good faith efforts to implement the policy. . .

*Hall*, 337 F.3d at 675. While this indicates the employer must make some showing on this inquiry, it does not indicate the burden of proof shifts to the employer on this element.

Additionally, the Sixth Circuit in *Hall* relied on the Seventh Circuit's analytical structure for punitive damages, and the Seventh Circuit has never characterized the good-faith efforts element as an affirmative defense on which the defendant bears the burden of proof. *See id., see also Lust v. Sealy, Inc.*, 383 F.3d 580, 589-90 (7th Cir. 2004); *Bruso*, 239 F.3d at 860-61 (while noting ". . . the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy"; court focused discussion on *plaintiff's* evidence on defendant's lack of good-faith efforts).

prior to trial are motions to dismiss and motions for summary judgment. If this were an affirmative defense, the defendant would have the burden of proving the defense. To invoke the defense prior to trial, the defendant would be the moving party on a motion to dismiss or motion for summary judgment. Since trial courts in evaluating these motions are required to view the evidence and draw all reasonable inferences from the evidence in the light most favorable to the *non*moving party, it would be a practical impossibility for a defendant to meet its evidentiary burden and prevail on either such motion. The district court would not be able to perform its gatekeeping function because the standard of review would prevent it from granting these motions on the punitive damages issue even in cases where the defendant could show good faith efforts. All such cases would proceed to trial on the punitive damages issue.

Therefore, for all of the reasons stated above, the Court cannot follow the circuits that have held this to be an affirmative defense. The Court believes, giving full force to the text of the majority opinion in *Kolstad*, considering the underlying purposes identified in the decision, and avoiding a return to the pre-*Kolstad* system, the most appropriate approach is a shifting burden of production (not proof) analytical scheme, much like the one set out in *McDonnell Douglas v. Green*. *See* 411 U.S. 792 (1973). The Court acknowledges this is a novel approach. The Court will proceed as follows.

The plaintiff's proof by a preponderance (1) that the defendant's employee acted with the requisite state of mind, and (2) that the defendant is vicariously liable for the employee's actions because the employee was "employed in a managerial capacity and was acting in the scope of employment," creates a rebuttable presumption of liability for punitive damages. *Kolstad*, 527 U.S. at 542. The employer then can rebut this presumption by articulating its "good-faith efforts to

39

comply with Title VII." *Id.* at 542-43, 545. The employer must do more than just produce evidence of the bare existence of a policy; it must present though proffer or other means that it actually "enforced" or "implemented" that policy. *See id.* at 546; *see also Hall,* 337 F.3d at 675. (". . . [I]t is not enough that the employer have a written or formal anti-discrimination policy. . . the employer must demonstrate that it engaged in good faith efforts to *implement* the policy.") (quoting *Bruso*, 239 F.3d at 858) (emphasis in original). Then, the burden of production shifts back to the plaintiff to counter this evidence by proving by a preponderance the employer did not actually make "good-faith efforts to comply with Title VII." The plaintiff could show, for example, the employer did not "enforce" or "implement" its antidiscrimination policy, or produce other evidence indicating the employer did not actually act in good-faith compliance with Title VII. *See id.* If the plaintiff is successful in her rebuttal, she may overcome the defendant's showing and the defendant may be found vicariously liable for punitive damages by a jury after a hearing. If the plaintiff is not successful, and the defendant employer meets its burden of producing evidence the discriminatory acts of its managerial agent were contrary to its "good-faith efforts to comply with Title VII," then the employer "may not be vicariously liable for the discriminatory employment decisions of managerial agents." *Id.* at 545.

The focus of both parties' showings on this element should be the employer's overall efforts, not merely its actions with regard to the case at hand, although those actions will be part of the analysis. In any case in which a plaintiff is successful in proving intentional discrimination, there was some breakdown of the defendant's antidiscrimination policy, since unlawful discrimination did take place. If every case in which an antidiscrimination policy did not work perfectly were appropriate for punitive damages, that is, virtually every case, the rejected system would return, and

40

the two-tiered approach envisioned by *Kolstad* would be thwarted. The Court agrees with the

circuits that have evaluated whether the employer's overall efforts showed good faith efforts to

comply with Title VII. A Fourth Circuit case, *Aiken Regional Medical Center,* demonstrates how

the defense should be evaluated. In that case, the court evaluated the defendant's overall efforts

even though the plaintiff's supervisor and the "designated point person for race discrimination

complaints" had ignored her complaints of race discrimination:

> In contrast to cases where employers "never adopted any anti-discrimination policy
> [or] provide[d] any training whatsoever on the subject of discrimination," *Anderson
> v. G.D.C., Inc.,* 281 F.3d 452, 461 (4th Cir. 2002), ARMC had an extensively
> implemented organization-wide Equal Employment Opportunity Policy. That
> policy, a version of which was included in the employee handbook, stated that "all
> persons are entitled to equal employment opportunity regardless of race" and that "it
> is and shall continue to be our policy to provide promotion and advancement
> opportunities in a non-discriminatory fashion." ARMC also created a grievance
> policy encouraging employees to bring forward claims of harassment, discrimination,
> or general dissatisfaction, and employees were explicitly informed that they would
> not be retaliated against for making a complaint. There was also a carefully
> developed diversity training program that included formal training classes and group
> exercises for hospital employees. And ARMC voluntarily monitored departmental
> demographics as part of an ongoing effort to keep the employee base reflective of the
> pool of potential employees in the area. These widespread anti-discrimination
> efforts, the existence of which appellee does not dispute, preclude the award of
> punitive damages in this case. As the Court noted in *Kolstad,* giving protection from
> punitive damages to "employers who make good-faith efforts to prevent
> discrimination in the workplace accomplishes Title VII's objective of motivat[ing]
> employers to detect and deter Title VII violations." 527 U.S. at 545-46, 119 S.Ct.
> 2118 (internal punctuation omitted).

333 F.3d at 548-49.

In *Kolstad,* Justice O'Connor cited another Fourth Circuit case for that circuit's observations

that, "[i]n some cases, the existence of a written policy *instituted* in good faith has operated as a total

bar to employer liability for punitive damages" and "the *institution* of a written sexual harassment

policy goes a long way towards dispelling any claim about the employer's 'reckless' or 'malicious'

state of mind." *See Kolstad,* 527 U.S. at 544 (citing *Harris v. L & L Wings*, 132 F.3d 978, 983, 984 (4th Cir. 1997)) (emphasis added).  In light of this, the Court believes a narrow focus on any breakdown of an antidiscrimination policy in the facts of the case before it would not be in accordance with Justice O'Connor's sentiment in *Kolstad*, that an antidiscrimination policy that has been "instituted" can be evidence of good faith efforts to comply with Title VII, even if it did not work perfectly in the case at hand.

Additionally, in every case that proceeds to trial, the defendant must have concluded the employee whose actions are at issue did nothing wrong, and there would have been little or no punishment of that employee, because if the defendant concluded the employee committed a discriminatory act, it is likely the case would have settled. Concentrating solely on an employer's failure to discipline the discriminating employee in the case at hand again would render most cases that proceed to trial appropriate for punitive damages, which would be in conflict with *Kolstad*'s two-tiered scheme.

Only by evaluating the employer's antidiscrimination policy, its conduct with relation to past and present antidiscrimination training, prevention and handling of other complaints of discrimination, and any discipline that resulted therefrom can the Court evaluate whether the employer has in fact engaged in "good-faith efforts to comply with Title VII."

## X.    **APPLICATION OF *KOLSTAD* TO THIS CASE**

Now having provided its interpretation of *Kolstad*, its analysis, and the framework within which it will make its decision, the Court will apply that interpretation and analysis to the facts of this case.

**A.     Employer's State of Mind**

Plaintiff asserts she has proven Defendants had the requisite mental state under both alternatives adopted by the Sixth Circuit in *Hall*. First, Plaintiff argues Julie Whitchurch's testimony at trial established Defendants' employee Bill Koepsel stated, when he learned of Plaintiff's pregnancy, "Well, I guess she'll want her six weeks' leave" (Court File No. 93, p. 3). Plaintiff contends this indicates "[a]t this point, Koepsel was placed on notice that firing Plaintiff for her pregnancy would violate federal law" (*Id.*). The Court does not follow this logic. Although this comment might show Koepsel had a discriminatory animus against pregnant employees, it does not show Koepsel knew firing Plaintiff because she was pregnant would violate federal antidiscrimination law. This comment merely relates to maternity leave, which may have been available under company policy or state law. Plaintiff also argues Koepsel "admitted" that he "knew that discriminating against Plaintiff because of her gender violated federal law and Defendant's [sic] own anti-discrimination policy" when, during a deposition, he answered a question about "what the harassment-free work environment is intended to be at Deltacom" (Court File No. 93, p. 3). Koepsel stated, "Basically inappropriate whether it be physical or verbal, hostile, any type of sexual advances." After being asked, "In your understanding does sexual harassment have to have sexual content?," Koepsel answered, "No" (*Id.*). This statement also does not indicate Koepsel knew he would violate federal antidiscrimination laws if he fired a woman because of her gender or pregnancy, it merely shows he had some bare-bones knowledge about sexual harassment in the workplace. Finally, Plaintiff asserts "Sheila Beverage [sic]," then Defendants' human resources manager, had the requisite mental state because, despite Defendants' "training program. . . regarding employment discrimination laws" and "in-depth procedure. . . for handling complaints of

43

discrimination in its human resources department," "Ms. Beverage [sic] did nothing to investigate [Plaintiff's] complaints or reprimand Mr. Koepsel" (Court File No. 93 at 5).[8] Again, Plaintiff has not shown what Defendants' training program regarding employment discrimination was, such that Beveridge would have had knowledge of federal antidiscrimination laws, and any discriminatory inaction on her part would have been done with knowledge it would violate those laws.

There may be evidence, either put into evidence during the trial on the merits or that has not yet been explored in depositions or discovery, that would indicate Koepsel, Beveridge, or other decisionmakers did have knowledge of federal antidiscrimination law or company policies or acted so egregiously that their actions are evidence of the requisite mental state, but Plaintiff has not yet pointed to any evidence that would prove any such knowledge. Plaintiff is instructed to pinpoint what evidence was submitted during the merits trial, with reference to the trial transcript, or what evidence could be introduced in the form of depositions, documents, or other proof, that would meet her burden of proof on the state of mind element. Defendants also should put forth specifically what proof they would submit in opposition to Plaintiff's arguments on this point. The Court would consider briefly reopening discovery limited to the issues surrounding punitive damages if necessary for the parties to obtain evidence on this point.

Alternatively, Plaintiff argues "the evidence at trial has established that several of Defendant's [sic] key witnesses lied to the jury in order to cover up their discriminatory actions" (Court File No. 93 at 5). Plaintiff has pointed to inconsistencies between the testimony of defense witnesses Koepsel, Beveridge, and Chris Hoffman and that of Plaintiff's witnesses concerning

---

[8]Plaintiff's assertion Beveridge "did nothing to investigate [Plaintiff's] complaints" was contradicted by the evidence during the trial.

events she presented as circumstantial evidence of discrimination.  This question is not as simple as Plaintiff asserts; it is not clear whether the jury found any of Defendants' witnesses lied in rendering its general verdict finding Defendants intentionally discriminated against Plaintiff.  As previously noted, simply because the jury found in favor of Plaintiff on liability does not necessarily mean it decided Defendants' witnesses lied; juries make credibility determinations based on a wide variety of factors, only one of which is a belief that the witness is lying.  Additionally, the Court interprets this manner of proving the requisite mental state narrowly, and mere inconsistencies between witnesses' testimony ordinarily will not be sufficient to show the defendant acted with the requisite "malice" or "reckless indifference."  However, Plaintiff is directed to specify the inconsistencies between her witnesses' testimony and that of Defendants' witnesses during the merits trial to which she refers, with reference to the trial transcript, in further briefing.  Evidence of major, unreconcilable inconsistencies, or attempts to cover up discrimination, if probative of the employees' mental state, might help Plaintiff show she could meet her burden of proof on this element.

### B.       Vicarious Liability

The Supreme Court in *Kolstad* set out several instances in which an agent's unlawful discrimination would lead to the employer's vicarious liability for punitive damages, *see Kolstad*, 527 U.S. at 542-43 (*quoting* Restatement (Second) of Agency § 217 C), but the Court will proceed to address whether an agent employed in a managerial capacity was acting in the scope of employment since the parties in their briefs focused on that theory of vicarious liability.  However, Plaintiff is directed to consider and submit any evidence that would lead to vicarious liability for Defendants on any of the other three theories set out in *Kolstad*.

1.    **Agent Employed in Managerial Capacity Acting in the Scope of Employment**

Plaintiff generally avers Koepsel was acting in a managerial capacity because, during the relevant period, he was regional director of sales for Defendants' North Alabama district; five branch managers reported to him; his "responsibilities included hiring, training, and firing employees in his entire region;" and he "drafted company policies and conducted regional training seminars" (Court File No. 93 at 7). Plaintiff also notes evidence was introduced at trial indicating Koepsel directed Julie Whitchurch, Plaintiff's supervisor, to fire Plaintiff, and Koepsel had authority to approve all termination decisions for that branch. In addition, Plaintiff argues the fact Sheila Beveridge testified she could not personally conduct an investigation into complaints against Koepsel because "he was too high up in management for [her] to deal with" indicates Koepsel was an "important" employee[9] (Court File No. 93 at 8). *See Kolstad*, 527 U.S. at 543.

Defendants argue Koepsel had no power to set policy for the company regarding sexual harassment, sales representatives, or performance improvement plans during the relevant time period, a factor Defendants point out a district court found relevant in *Steinhoff v. Upriver Restaurant Joint Venture*, 117 F. Supp. 2d 598, 600 (E.D. Ky. 2000). While the *Steinhoff* court may have found this factor relevant in that case, the Court will focus its analysis on the factors on which the Supreme Court in *Kolstad* relied, and its analysis of agency law above. These include "the type

-------------------------

[9]The Court would note it is not convinced by Plaintiff's argument Koepsel must have acted in a mangerial capacity because he now "serve[s] as [Defendants'] company representative at counsel's table," and therefore he must not be "an insignificant employee" (Court File No. 93 at 8). Parties have many reasons for choosing representatives to sit at counsel's table, and this choice alone does not show "the type of authority that the employer has given to the employee [or] the amount of discretion that the employee has in what is done and how it is accomplished." *See Kolstad,* 527 U.S. at 543.

46

of authority that the employer has given to the employee [and] the amount of discretion that the employee has in what is done and how it is accomplished." *Kolstad*, 527 U.S. at 543. An employee with policymaking authority generally will be a managerial agent, but there is no sound reason to limit the concept to just policymaking employees. In all cases a policymaker's position is usually indicative of the amount of authority or discretion the employer gave to the employee, but it is certainly true that some employees without policymaking authority will enjoy broad authority or discretion in the day-to-day affairs of a workplace.

Plaintiff also argues Illustration 3 from the vicarious liability section of the Restatement of Torts, cited by the Court in *Kolstad*, requires a conclusion that Koepsel was a managerial agent. *See id*. The Illustration refers specifically to an "operations manager who supervises the management of a series of retail stores." *See* Restatement (Second) of Torts § 909, Illus. 3 (1979). The Chief Operations Officer ("COO") is one of the highest executive officers in a corporation. Such an "operations manager" would clearly be a policymaker with broad authority, and a managerial agent. In some corporations, there are a number of operations mangers with authority over large geographical regions or subsidiaries. Such managers also would possess policymaking authority and would be managerial agents. Operations managers in smaller concerns may possess much less discretion and authority and would not possess policymaking authority, and would likely not be a company policymaker or managerial agent. From this it is evident that it is an employee's *function*, and the type and size of company in which an employee works, not the title or position, that is important in this analysis.

The Court would need to evaluate Koepsel's functions within the company and other factors to determine whether he is similar to the operations manager described in the Restatement

47

Illustration. Evidence at the trial on the merits of Plaintiff's claims indicated Koepsel, as regional director of sales for the North Alabama district, was involved in the supervision of the five branches he oversaw. Thus Koepsel has some similarity to the operations manager in the Restatement Illustration, although it is not clear whether he actually acted as an "operations manager." However, any likeness to the Illustration alone would not be determinative in the Court's managerial capacity analysis, but would be one factor among the several factors *Kolstad* directs district courts to consider.

In sum, Plaintiff has not been specific enough in pointing to evidence supporting her arguments for the Court to determine whether she may be able to carry her burden of proof on this point.

## 2. Good Faith Efforts to Comply with Title VII

The parties' arguments on this issue for the most part miss the point, since they spend a great deal of time discussing what happened with regard to complaints Plaintiff may or may not have made about Koepsel's actions towards her. Defendants' actions regarding any complaints Plaintiff may have made are of marginal relevance to the ultimate determination of whether they engaged in good faith efforts to comply with Title VII. As explained above, the Court's analysis here will focus not on the facts of the case at hand, but on the overall efforts of the defendant with regard to antidiscrimination efforts. This calls for an examination of the Defendants' general practice with respect to its compliance with Title VII, not what may or may not have happened with respect to Plaintiff. If Defendants handled Plaintiff's complaint properly, that does not necessarily mean they had an effective antidiscrimination policy, and if they bungled Plaintiffs' complaint, that does not necessarily mean they had an ineffective antidiscrimination policy. The parties must focus on the

48

overall company, not just one supervisor or branch office.

Defendants have put forth as evidence of their "good-faith efforts to comply with Title VII" the facts that they had an antidiscrimination policy in their employee handbook about which a number of employees and former employees, specifically Plaintiff and her supervisor Julie Whitchurch, testified they knew; the policy was implemented by wide dissemination throughout the company and by training including discussion of the antidiscrimination policy; and numerous employees called and e-mailed Defendants' human resources department with complaints, in accordance with the policy (Court File No. 94 at 2). Defendants also assert they implemented this policy, because in response to Plaintiff's and Julie Whitchurch's complaints about Koepsel discriminating against Plaintiff, Defendants' former human resources manager Sheila Beveridge "immediately" investigated the claims by calling all or most of the employees in the Chattanooga office, including a former employee, before ultimately concluding Plaintiff's termination was "performance based" (Court File No. 94 at 2, 3). This thorough investigation, Defendants argue, shows they implemented their antidiscrimination policy, and makes this case distinguishable from cases in which other courts have held sham or cursory investigations of complaints were insufficient evidence of "good-faith efforts to comply with Title VII." However, Defendants also state "[s]ince Koepsel held a position in the company that was higher than [Beveridge], she provided the information to her supervisor, who in turn provided the information to Chris Hoffman who raised the issues to Roger Woodward on the Senior Vice President level" (Court File No. 94 at 3).

Defendants have not indicated what language their antidiscrimination policy contains regarding discrimination, such that the policy is an attempt to comply with Title VII. Defendants also have not indicated what the *outcome* of their investigation into Plaintiff's and Julie

49

Whitchurch's complaints was, a key fact in the Court's evaluation of whether any antidiscrimination policy actually was implemented or enforced such that it is evidence of "good-faith efforts to comply with Title VII." Additionally, Defendants' reaction to Plaintiff's complaint is only the beginning of the Court's inquiry into whether Defendants made good faith efforts to comply with Title VII, which must also include Defendants' responses to other complaints or incidents of discrimination. More evidence is necessary for the Court to make a decision on whether a trial is necessary on this point, and Defendants are directed to submit it in further briefs, along with details regarding the type of dissemination and training with which it has been implemented. *See Hall,* 337 F.3d at 675.

Plaintiff argues she can refute these assertions because Defendants did not actually implement an antidiscrimination policy. First, Plaintiff contests Defendants' assertion Beveridge "immediately" investigated Plaintiff's complaint; Plaintiff asserts while Plaintiff complained in late February 2003, no investigation took place until after Julie Whitchurch submitted a written complaint, in May 2003, and that investigation focused on Whitchurch's complaints, not those of Plaintiff (Court File No. 95, p. 2).[10] Further, Plaintiff argues Beveridge passed complaints about Koepsel to Koepsel's supervisor Chris Hoffman, who in turn passed them to his supervisor Roger Woodward, thus the antidiscrimination policy was not implemented because Defendants merely passed the "buck. . . up the chain of command until it was heard from no more" (Court File No. 93 at 9). Plaintiff also focuses on the lack of evidence concerning the outcome of the investigation into allegations against Koepsel, and would characterize that lack of evidence as an indication Koepsel

---

[10]Defendants assert, in turn, "it is undisputed that [Beveridge] began her investigation of [Plaintiff's] complaint immediately after the first [complaint]" (Court File No. 97, p. 2). The Court directs the parties to indicate specific portions of the merits trial transcript that could resolve this conflict in the parties' recollections of the proof.

50

was not disciplined. Although Plaintiff notes Koepsel testified at trial he was not reprimanded, the Court recalls the evidence at trial did not delve into whether any other discipline other than a "reprimand" was issued. Plaintiff has not indicated what particular evidence, documentary or testimonial, she would put forth to support these assertions at a trial on punitive damages, and, again, Plaintiff has not pointed to evidence of Defendants' response to other complaints or incidents of discrimination.

In response to Plaintiff's allegations on this point, Defendants seem to argue that because the record is completely devoid of evidence regarding the outcome of this investigation by Hoffman or Woodward, there is no evidence they did not engage in good-faith efforts to comply with Title VII, and thus they should prevail on this point (See Court File No. 94 at 7-9). Under the analytical structure set out *supra*, the Court places a burden of production on Defendants to articulate what their good-faith efforts were and how they were implemented and enforced in order to avoid punitive damages. A lack of evidence "the claims made by [Plaintiff] or Whitchurch were not taken seriously" is not equal to evidence Defendants did take those complaints seriously (*Id*. at 3) or more importantly, they had made a good faith effort to comply with Title VII. Because neither side focused on the issues relevant to punitive damages during trial, neither side introduced evidence pertinent to these issues (*see id*). The parties must come forward with such evidence.

## XII. <u>CONCLUSION</u>

For the reasons explained herein, the Court will not be able to make a decision on Plaintiff's motion for a punitive damages trial until the parties submit further briefs outlining the particular proof they will be able to submit in support of their arguments. The Court therefore will **ORDER**

51

the parties to submit such further briefs on these issues.  Only then will the Court be able to perform

its gatekeeper function, evaluate the proposed proof, and determine whether a trial on the issue of

punitive damages is appropriate.  If the parties find it will be necessary to briefly reopen discovery

on these issues only in order to better marshal the proof, they should so indicate to the Court in the

form of a motion.

An Order shall enter:

_____**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**